

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-15-00208-CR

KRIS EDWARD RAU                                                    APPELLANT

V.

THE STATE OF TEXAS                                                      STATE

----------

### FROM THE 271ST DISTRICT COURT OF WISE COUNTY
### TRIAL COURT NO. CR17812

----------

## MEMORANDUM OPINION[1]

----------

A jury convicted Appellant Kris Edward Rau of murder and assessed his punishment at confinement for life and a $10,000 fine. The trial court sentenced him accordingly. In seven issues, Appellant contends that the evidence is insufficient to support his murder conviction and complains about the admission of testimony of a jailhouse informant, a witness's reference to a polygrapher, and

---

[1]See Tex. R. App. P. 47.4.

the prosecutor's argument at punishment. Because we hold that the evidence is sufficient to support Appellant's conviction and that the trial court did not reversibly err, we affirm the trial court's judgment.

## I. Background Facts

### A. Lianne Was a Single Mother of Two Adult Children and Owned Real Property in Texas and Florida.

When she died on April 14, 2014, single mother Lianne Murray had two grown children, Allisyn Ramirez and Daniel Murray, was a grandmother of a young boy, and was eagerly awaiting the birth of her second grandson in May. Her father had committed suicide in April 2009 by shooting himself, and her mother had passed away a short time later, suffering from dementia and estranged from Lianne. Lianne and her sister, Robin White, had never gotten along and had quarreled over their parents' estate.

Lianne had two homes: (1) a house and plant nursery on a thirteen-acre tract on Pine Island, Florida that she had inherited from her parents and (2) forty-five acres in Wise County, Texas on which sat a steel building containing a garage and house.

### B. Lianne Met Appellant Online and Soon Moved in with Him.

At the end of August 2013, Lianne was living in Pine Island, Florida and met Appellant on Match.com. Shortly thereafter, Lianne moved into the house Appellant rented in Fort Myers, Florida. She and Appellant's sister, Kelly Rau, became friends, but Lianne's children did not care for Appellant, and he knew it.

2

**C.      Lianne Returned to Texas, and Appellant Moved in with Her.**

In late 2013, as was her custom, Lianne returned to Texas temporarily to work as a home healthcare nurse for a local agency, supplementing her income from the nursery.  At the time of her death, Lianne was working full-time five nights a week in a home caring for a severely handicapped child and working extra shifts in other homes when possible.  Lianne also remained actively involved in the daily running of the nursery in Florida even while she was in Texas, and she stayed in constant contact with Allisyn, who worked at the nursery along with her husband and Daniel.

Appellant visited Lianne in Texas in December 2013 and spent much of his time and money improving the Wise County property.  Around Christmas, Lianne told her children that she was going to permanently live in Texas and Appellant was going to move to Texas to live with her.

Appellant quit his job in Florida and cashed in his retirement account.  He moved in with Lianne on February 14, 2014.

**D.      Appellant Quit His Job in Texas after One Week, Improved Lianne's Rustic Property, and Rapidly Depleted His Retirement Proceeds.**

On February 28, 2014, Appellant started working as a welder in nearby Bridgeport, Texas.  A week later, he received his retirement proceeds in the amount of $32,374.36 and quit his welding job.  He deposited approximately $29,000 in two separate accounts at a local bank.

Appellant put a lot of labor and money into Lianne's Texas property: mowing; trimming trees; building a 1,000-foot, four-board fence; and making other repairs and improvements. He gave Lianne around $6,000 to help her pay debts, including her son Daniel's expenses, which Appellant greatly resented. Appellant also bought a tractor, a tiller, and a mower.[2] On the day of Lianne's death, Appellant only had about $800 left in his two bank accounts.

**E.    Lianne Planned to Return to Florida in May 2014 and Bring Daniel Back to Texas to Live with Her.**

Lianne planned to fly to Florida when Allisyn's second child was born in May 2014 and then drive back to Texas with Daniel, who would live with Appellant and Lianne temporarily while finding his own place and before beginning classes at the University of North Texas in the fall. On Saturday, April 12, 2014, Lianne texted Allisyn that she would soon be able to purchase her plane ticket to Florida. That same night, Lianne also told the mother of one of her patients that she would soon return to Florida.

**F.    Appellant and Lianne Fought, She Died from a Gunshot Wound, and He Drove from Texas to His Sister Kelly's Home in Lee County, Florida.**

On Sunday, April 13, 2014, the couple had a physically violent argument, and Lianne told Appellant to leave her home or she would call the police. The next day, April 14, 2014, sometime after Lianne returned from working her

---

[2]Lianne insisted that her name be included on the invoice and check for those items.

overnight shift, she died in the front yard of her Wise County home from a gunshot wound to her throat.

After Lianne's death but on the same day, Appellant left her Wise County home and drove to the home of his sister, Kelly, in Lee County, Florida. On the way, he disposed of his Glock .40 semiautomatic pistol.

**G.      Lee County, Florida and Wise County, Texas Law Enforcement Officers Interviewed Appellant, and the Wise County Sheriff's Office Investigated Lianne's Death.**

When Appellant arrived at Kelly's home on April 15, 2014, he told her about Lianne's death, and she called 911 while he was in the shower.

At trial, Detective Jaime Nolan of the Lee County, Florida Sheriff's Office testified that on April 15, 2014, he and Detective Robert Patton responded to Kelly's 911 call and then brought Appellant to their office for an interview. Joshua Reynolds, an investigator for the Wise County, Texas Sheriff's Office, began an investigation on April 15, 2014 after receiving information from the Lee County, Florida Sheriff's Office that a possible homicide had taken place in Wise County.

Investigator Reynolds visited Lianne's Wise County property and discovered her body wrapped in a blanket and plastic and lying in the garage. She had been shot under her chin, on the left side of her neck. After finding Lianne's body, Reynolds traveled to Florida to interview Appellant. Appellant was interviewed on two separate days by Detectives Nolan and Patton, and Investigator Reynolds also interviewed him on the second day.

5

**H.    Despite His Assertion That Lianne Shot Herself, Appellant Was Arrested, Indicted for Murder, and Jailed.**

Appellant, who, by his own timeline, left Lianne's Wise County home less than an hour after finding her dead and drove straight to Lee County, Florida, stated in his interviews with law enforcement that Lianne had committed suicide by shooting herself with his pistol.

A Wise County grand jury indicted Appellant for murder on June 26, 2014, and he was confined in the Wise County jail pending his trial.

**I.    Appellant Confessed to a Jailhouse Informant.**

One of Appellant's cellmates, William Wayne Cox, told law enforcement (and later the jury) that Appellant had confessed to murdering Lianne.

**II.    The Evidence Is Sufficient to Support Appellant's Murder Conviction.**

In his first two issues, Appellant contends that the evidence is insufficient to support his conviction for murder.  Specifically, in his first issue, he contends that the evidence is insufficient to prove the essential elements of murder, and in his second issue, he contends that the evidence is insufficient to prove that he acted with the requisite mental state.

**A.    Standard of Review**

In our due-process review of the sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict, even improperly admitted evidence, to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable

6

doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *Moff v. State*, 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004).  This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

The trier of fact is the sole judge of the weight and credibility of the evidence.  *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016).  Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder.  *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012).  Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict.  *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015).  We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution.  *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33.

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt.  *Jenkins*, 493 S.W.3d at 599.  Although motive and opportunity are not elements of a criminal offense, they can be circumstances that are indicative of

7

guilt and therefore may be properly considered in an evidentiary sufficiency review. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). Evidence of flight, of threatening a witness, and of concealing or destroying evidence is also circumstantial evidence of guilt. *Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) (flight); *Guevara v. State*, 152 S.W.3d 45, 50–51 (Tex. Crim. App. 2004) (concealing evidence); *Johnson v. State*, 425 S.W.3d 344, 346 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (threatening witness).

In determining the sufficiency of the evidence to show intent, and faced with a record that supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). We must review circumstantial evidence of intent with the same scrutiny as evidence of other elements of an offense. *Thornton v. State*, 425 S.W.3d 289, 304 (Tex. Crim. App. 2014).

## B.    Elements of Murder

The indictment charged that Appellant intentionally or knowingly caused Lianne's death by shooting her with a firearm or, alternatively, acting with intent to cause Lianne serious bodily injury, he committed an act clearly dangerous to human life that caused her death by shooting her with a firearm. *See* Tex. Penal Code Ann. § 19.02(b)(1), (2) (West 2011).

8

## C.     Theories of the Case

For the majority of his interviews with law enforcement, Appellant's theory was that Lianne had committed suicide.  When Investigator Reynolds indicated to him that forensics did not support suicide, Appellant raised his voice and said that the neighbors or Lianne's children could have shot her.  The State's theory was that Appellant killed Lianne soon after she arrived home from work, attempted to give himself an alibi by running several errands in different locales near the home, and destroyed or hid evidence to hide his culpability and promote his suicide story.

## D.     The Evidence

Thirty-one people testified during the guilt-innocence phase of trial, and the trial court admitted almost 300 exhibits.  Appellant exercised his right not to testify, but his recorded interviews with law enforcement were admitted and played for the jury.

### 1.     Chronology of Key Events

#### a.     April 13, 2014:  Appellant and Lianne Fight and She Tells Him to Leave.

Appellant acknowledged in his interviews with law enforcement that he and Lianne, whom he described as his girlfriend of six months, had a physical altercation on Sunday, April 13, 2014, the night before her death.  He claimed that she had attacked him.  He then pushed her backwards against a wall and grabbed her—hard enough to leave bruises the next day—"trying to hold [her] so

9

[he could] talk to [her]" or "trying to get [her] to stop swinging and whaling at [him]." When he let go, Lianne kicked him in the testicles and went outside.

Appellant's sister Kelly testified that Appellant discussed the fight with her after Lianne's death. Kelly's account differed slightly from her brother's. She testified that Appellant told her that after Lianne kicked him in the scrotum, he "held her down on the ground . . . because she had said she was done and she didn't stop."

After their fight, Lianne called Appellant a "wife-beater" and left early for her regular overnight nursing shift. He reported that they spoke and texted multiple times Sunday night, and cell phone records show that eight calls were made that night from his phone to hers, beginning at 8:02 p.m. In addition, she texted him a message demanding that he leave her house or she would call the police.

### b.     April 14, 2014:  Lianne Is Killed.

#### i.     Morning:  Lianne Returns from Work and Appellant's Errands Begin.

Appellant initially told the Florida detectives that by the time Lianne returned home from work around 9:00 or 9:10 a.m. on Monday, April 14, 2014, she was still mad at him, but she wanted a hug and no longer wanted him to leave. Appellant stated that she told him that she was going to take a tranquilizer, she did take it as far as he knew, and then she showered and went to sleep.

10

In his second interview with law enforcement, Appellant remembered running some errands on the morning of April 14, 2014, after Lianne went to sleep. He told the Florida detectives that he went to:

- his bank in Lake Worth, Texas and closed his savings account;

- a Verizon store, about a mile away from the bank, where he paid his cell phone bill;

- a manufacturing business with a big banner seeking job applicants; and

- a motor sports business to buy an off-road vehicle permit.

### ii. Mid-Afternoon: Appellant Answers Allisyn's Call to Lianne and Lianne Is "Wobbly."

Appellant initially reported that he arrived back home around 1:30 p.m. because at 2:00 p.m., he answered on the house phone via Bluetooth a call from Allisyn to Lianne's cell phone. Allisyn testified that she called her mother at 1:54 p.m. and for the first time ever, Appellant answered Lianne's phone. He whispered, "[O]h, hey, sweetie, your mom's asleep. You'll have to call her later." Allisyn testified that Lianne worked nights, so her sleeping during the day would not have been unusual.

Lisa Upton, a telecommunications analyst with the Texas Department of Public Safety (DPS), testified at trial that she performs cell phone mapping. Upton claimed that none of the many calls placed to Lianne's cell phone on April 14, 2014 after the 1:54 p.m. call hit a tower. Upton explained that when calls go to voice mail, a tower is not hit. Further, she testified that calls go to voice mail

11

when the phone is turned off, not answered, or destroyed or when its battery is dead.

Changing his initial story that he returned home around 1:30 p.m., Appellant stated later in his interviews that he must have arrived home closer to 12:30 p.m. because he was there when Lianne woke up at 1:00 p.m. to use the bathroom. Appellant said that he asked Lianne at that time if she had a postage stamp, but she did not acknowledge him and went back to bed.

According to Appellant, Lianne got up again at 3:00 p.m., told him she was going back to bed, and again went in the bathroom. Appellant speculated that she might have taken another pill because she was "wobbly" and "her motor skills seemed funny" when she left the bathroom. Appellant said that she made a cup of coffee and went back to bed.

### iii. Late Afternoon: Appellant Runs More Errands, Lianne Allegedly Acts Woozy and "Pill-Drunk," and Lianne Is Killed.

Appellant told law enforcement that while Lianne was sleeping, he went to get gas sometime after 3:00 p.m. and arrived back at the house sometime around 4:00 p.m. He reported that Lianne was awake and moving around at that time.

### (a) Lianne's Behavior is "Weird" When Appellant Returns from Second Errand Trip.

Appellant stated that after his return:

12

- Lianne was "weird-acting," "spiteful," "almost like a drunk but from pills," "ornery," and "angry";

- She was "kind of pale," "woozy," and "a little bit pill-drunk";

- She was not crying but seemed "blah";

- She got a cup of coffee;

- She put on her sweats, slippers, and a multicolored shirt;

- She carried her boots to the front porch and sat in a chair;

- She refused his second request for a postage stamp, so he told her he was going to town; and

- She asked him to also pick up dog food for their three dogs in town.

Even though he thought she was "pill-drunk," Appellant did not check Lianne's pupils or invite her to go with him.

### (b)   Appellant Leaves Lianne's Home a Third Time to Purchase Forty Pounds of Dog Food and a Single Postage Stamp.

Appellant told the Florida detectives that he left home a third time about 4:15 p.m.  At 4:23 p.m., he called McKinley Farms Tractor Sales, from which the tractor had been purchased.  Store employees had recently hauled the tractor back to the store for repairs.  Appellant spoke to salesman Roger McKinley and said, "I have a situation.  I need to just sell the tractor back to you or have you sell it for me and give me $6,500."

Appellant told the Florida detectives that around 4:45 p.m., he was at the post office in Bridgeport, about sixteen miles from Lianne's home, where he bought a single stamp with cash.  Initially, he could not remember if a man or

13

woman waited on him. In his second interview, Appellant recalled that a man waited on him and that he paid a dollar for the stamp and received change back.

Appellant said that after leaving the post office, he traveled about four miles to Brookshire's grocery store, where he bought a forty-pound bag of Purina dog food for approximately forty dollars including tax. While he did not initially remember how he paid, in his second interview he remembered that a woman had waited on him and that he had paid with his debit card and received cash back. Appellant stated that the post office and the grocery store were about five to ten minutes apart. The Brookshire's video shows him leaving the parking lot at 4:43 p.m.

Law enforcement did not believe that Appellant returned to Lianne's house after getting gas and before going to the post office in Bridgeport. Investigator Jack McGuinn of the Wise County District Attorney's Office testified there was not enough time for Appellant to do so, based on the time that he got gas and the time that his cell phone hit or pinged the Lake Bridgeport tower. Appellant got gas at 4:01 p.m. at the Salt Creek Grocery store 9.2 miles southeast of Lianne's house. He made the call to the tractor store at 4:23 p.m.; that call pinged the Lake Bridgeport tower. McGuinn testified that it would have taken Appellant about twenty-three minutes to get from the Salt Creek Grocery store to a place where the call could ping that tower and thirty-six minutes to get to the same place if after leaving the store, he first drove past Lianne's house without stopping. But, Investigator McGuinn admitted that he could not pinpoint the

14

exact location of Appellant's cell phone at the time of the call. Investigator McGuinn also explained that if Appellant did not return to the house after getting gas and before going to the post office, he never had the interactions with Lianne in which she was "woozy," "pill-drunk," "blah," and "weird-acting." Instead, Investigator McGuinn concluded that Appellant made up this scenario to support his suicide story.

### (c) Appellant Returns to Lianne's House from Bridgeport and Sees Lianne's Body Lying in the Yard.

Appellant told the Florida detectives that he arrived home about 5:25 p.m. and discovered Lianne's body lying in the front yard. It takes about twenty-three minutes to get to Lianne's house from Brookshire's, so Investigator McGuinn estimated at trial that Appellant would have been back at the house around 5:15 p.m.[3] In fact, Appellant's cell phone received a call at 5:16 p.m., and cell phone mapping evidence indicated that he was at or very near Lianne's house at that time.

### iv. Early Evening: Appellant Takes Action After Lianne's Death and Leaves for Florida.

Appellant estimated that he probably left for Florida about thirty to forty-five minutes after he returned to Lianne's house, but he also stated that he left at "probably 6:30 p.m." Regardless, he said that he left for Florida while it was still

---

[3]Investigator McGuinn admitted that he had relied on Google for his timing conclusions and that different variables could affect how long it takes to get from one location to another.

15

daylight.

### (a) Appellant Prepares for the Trip.

Appellant told the Florida detectives that during the time period after he found Lianne's body and before he left for Florida he:

- cried and thought about killing himself;

- hosed down the area where he found Lianne's body;

- wrapped her in a comforter and plastic;

- dragged her to the garage;

- hitched a trailer to his pickup;

- loaded a Polaris Ranger utility vehicle and mower on the trailer and strapped them in;

- fed and watered the dogs;

- wrote a note to explain what had happened;

- left the note in his sock drawer;

- got a duffle bag out;

- retrieved the holster for his pistol;

- packed some clothes and several boxes of shells for his .308 rifle;

- changed the jeans and sweatshirt he wore when he discovered Lianne's body because he was going on a trip, and swapped his boots for tennis shoes;

- packed an ice chest with yogurt, mints, drinks, and other snacks; and

- put his .308 rifle in the floor board of the pickup and the pistol and its holster in the center console of his pickup (because he thought he might still kill himself).

16

A note drafted by Appellant and found under the socks in his drawer by Wise County law enforcement stated:

- the couple had been arguing for weeks;

- Lianne had been working nights;

- she was thousands of dollars behind on bills;

- Appellant helped her by paying several thousand dollars toward her bills;

- the previous week, Lianne told Appellant that she needed help dealing with her father's suicide;

- she sent Appellant to town for dog food and to get a postage stamp;

- Appellant "C[a]me Home and Lian[n]e shot Her self with [his pistol] in front Yard";

- he wrapped Lianne's body up and put it in the barn;

- he "Loaded Some of [his] Personal P[ossessions] and Titles to Take to [his] family in [Florida]";

- he did "not want to Live after finding The One [he] Love[d] shot Herself with [his pistol];" and

- Lianne was mentally unstable.

### (b) Appellant Drives to Florida.

Appellant told the Florida detectives that he drove to Kelly's house in Fort Myers, Florida only stopping to get gas and to make brief rest stops. He did not remember where he stopped along the way but stated that he had carried $300, withdrawn $200 from an ATM at a gas station near Tyler, and bought gas on the trip using cash or his check card. Evidence showed that he got gas in Lindale, Texas at 9:02 p.m.

17

Investigator McGuinn testified that the minimum time it would take somebody to travel from Lianne's Wise County home to Lindale was three hours and fifteen minutes, which meant that Appellant had to have left Lianne's house by 5:45 p.m. Based on McGuinn's conclusion—borne out by the cell phone evidence—Appellant returned to Lianne's house from completing his errands around 5:15 p.m. McGuinn testified that Appellant could not have done all the things he claimed to have done during the thirty minutes he was at Lianne's home. McGuinn surmised that this was further evidence that Lianne was dead before Appellant even went to get gas on the afternoon of April 14, 2014.[4]

Like Investigator McGuinn, Lee County Detective Nolan testified that he did not believe that Appellant could have completed all the tasks he said he did in the short amount of time that he said elapsed after he found the body and before he left for Florida.

### c. Appellant Arrives at Kelly's House on April 15, 2014.

Appellant estimated that it took him twenty-three or twenty-four hours to reach Kelly's house on April 15, 2014 but admitted that it is usually a twenty-hour drive from Texas to Florida. He arrived at Kelly's home in the afternoon and told her what had happened, and she called 911 while he was in the shower. The

---

[4]However, Investigator McGuinn conceded on cross-examination that he did not know how much time the tasks took, how fast Appellant drove, or where exactly the cell calls were made from.

Florida detectives arrived, and Appellant's first interview with law enforcement began that evening.

### d. Appellant Later Explains Why He Drove to Florida After He Found Lianne's Body.

Appellant told law enforcement that he fled to Florida because he did not know anyone in Texas and he also wanted to heal his relationship with his sister Kelly and her husband, Charlie, by giving his rifle and ammunition to Charlie. Appellant further stated that he wanted to tell his family what had happened to Lianne in person. During Kelly's testimony, the State played a recording of a call between Appellant and his mother in which Appellant complained that Kelly had not given him time to hide the rifle he brought back from Texas before calling 911.

### 2. The Crime Scene

### a. The Body

In his interviews with the Florida detectives, Appellant stated that when he arrived home and saw Lianne's body on the ground:

- she was flat;

- she was wearing her outdoor clothes;

- her legs were parted a little;

- her eyes were open;

- the bullet hole was in her neck;

- there was "so much blood on her face";

19

- "heavy blood" pooled by the back of her head;

- blood was "everywhere";

- "blood had gurgled out of her mouth"; and

- blood "oozed out of her mouth."

Appellant further described the blood as being around the back of Lianne's neck and her neck area.

Appellant told the Florida detectives that he knew that Lianne was dead and that she looked like she had been dead for fifteen to twenty minutes. He also said that she was "bluish green yellow." Appellant's sister Kelly testified that he told her Lianne's hands were "like [a] bluish-purple color."

Appellant also stated in his interviews that Lianne smelled bad and "of a dead person." Upon further questioning, he clarified that it was not a rotten smell because she had not been dead several days but maybe it was the smell of blood.

Detective Nolan challenged Appellant's account of finding the body, testifying that he had never seen a body dead for fifteen to thirty minutes that was bluish-green or yellow and that such a body would not yet smell of decomposition.

Appellant described Lianne's hands as lying on her left upper chest. Detective Nolan and Texas Ranger Ron Pettigrew both testified that a decedent's hands resting up near her shoulder would be inconsistent with the previous suicides they had seen. Investigator Reynolds testified that when he found

Lianne's body in her garage, one hand was up near her chest, but the other hand, the right hand, was straight down her right side.

### b. Location of the Pistol

Appellant variously claimed that he found his pistol "right by" Lianne's body, "by her hands," to the left of her chest, "pretty close" to her neck, and on her upper left chest area near her hands. He could not remember how the pistol was positioned. Detective Nolan testified that the pistol could not have landed where Appellant said he found it. Ranger Pettigrew testified that a semiautomatic, like Appellant's pistol, would usually jam after a suicide; that the recoil of the gun and its spring going back would move the gun down, and that a pistol being found with the decedent's hands on their shoulder would be inconsistent with suicide scenes that he had observed.

### c. Lianne's Car

Investigator Reynolds and Ranger Pettigrew testified that Lianne's purse, work materials, and packed lunch bag were found inside her unlocked car, "like she just stepped out of the vehicle with everything else left inside." Ranger Pettigrew also said that it did not appear that she had taken anything into the house, but he admitted that he did not know if she normally left her purse in the car.

### 3. Appellant's Tampering with the Scene

#### a. Touching Lianne's Hands

Appellant stated in his interviews with law enforcement that after finding the body, he picked up Lianne's hands and held them. They were limp. He described her hands as being neither hot nor cold. Later, he stated that she was cold, and Kelly testified that he told her that when he grabbed Lianne's hands they were cold.

Appellant originally told the Florida detectives that he did not think that any of her blood got on him because he saw no blood on Lianne's hands or her arms. In speaking with Wise County Investigator Reynolds, he said that he did not remember blood being on her hands, his hands, or the pistol. Further, even though he told Detective Nolan that there was no blood on Lianne's hands, he later said that he might have cleaned her hands but never touched her face. Rather, he offered that Lianne's dogs might have licked her face. In contrast to Appellant's story, his sister Kelly testified that Appellant had told her that he had blood on his hands from picking up the pistol.

#### b. Moving, Wrapping, and Concealing the Body

Appellant told the Florida detectives that Lianne's puppy was near her body and in the pool of blood when he found the body and Lianne's two older dogs also came up to the body soon after he found it. Appellant claimed that he had nowhere to put the dogs to keep them away from the body because he and

Lianne allowed them to go in and out of the barn at will. He did not dispute that pens were on the property, but he claimed they were puppy pens, not dog pens.

After finding the body, Appellant grabbed Lianne's comforter from the couch inside the house and rolled her up in it. He told the Florida detectives that he did it because the dogs wanted to get "in the mess." Later he stated that he was trying to protect the body from the dogs. Appellant explained to the Florida detectives that blood soaked through the comforter, and the dogs were still sniffing around it, so he wrapped plastic sheeting from the garage around the body. Elsewhere in the interview, Appellant said that he "scooted" the body onto the comforter, he did not remember whether he rolled the body in it, he might have rolled the body in the plastic but did not remember, and he "just did it." Appellant said that he did not consider what wrapping would do to the body and did not know if the body sustained any injuries when he rolled it up.

Appellant dragged Lianne's body by the feet into the garage and put it beside a four-wheeled, off-road vehicle. He stated that he left the garage door open so the dogs could get in to eat, but he later stated that he closed the roll-up garage door. Appellant explained that he did not move Lianne's body into the house because her adult children would inherit it and would be traumatized if her body were in the house.

Appellant said that after he moved Lianne's body "out of the way," he rinsed some of the "thick, red blood from where her head was laying" and maybe a piece of her skull away with the water hose.

Investigator Reynolds testified that despite Appellant's statement in his interviews that the dogs had been getting into Lianne's blood, no bloody dog prints were found anywhere on the scene, and no blood was found on any of the dogs.

Investigator Reynolds also testified that when he unwrapped the body, it was wet, which is not normal, Lianne's hair had been slicked back, and it appeared that her face had been wiped off.[5]  She appeared to have an injury on the right side of the top of her head under her hair.  Her clothes were stained with blood and some other kind of liquid.

### c.    Rinsing the Blood from the Ground

At the scene, Investigator Reynolds also located a grassy area that tested positive for blood adjacent to the porch, but he testified that the whole crime scene had been sprayed with water and the blood had been washed away. Detective Nolan testified that it is important to see the blood pattern when investigating a suspicious death, but it was not possible here because Appellant destroyed that evidence.

---

[5]Investigator Reynolds admitted that his report had initially said that her hair was wet with blood but stated that he later clarified in the report that it was wet with water.

### d. The Pistol, Bullet, and Shell Casing

#### i. Picking Up and Disposing of the Pistol

Appellant told the Florida detectives that he picked up his pistol to kill himself but was afraid that his family would think that he had also killed Lianne. Initially, he told the Florida detectives that he did not examine the pistol or notice how many bullets were left in it when he picked it up. He also stated that before he left the house, he might have popped a different "clip" in the pistol from the gun case inside Lianne's house but he did not remember. When speaking with Wise County Investigator Reynolds, however, Appellant stated that the pistol was ready to fire when he grabbed it. Appellant told law enforcement that he was afraid to call 911 from the scene because Lianne had been killed with his pistol and because he had touched the pistol, leaving fingerprints, when he picked it up with the intention of killing himself.

Appellant told the Florida detectives that after dark on his trip to Florida, he had thrown his pistol and its holster off a bridge on Interstate 10 somewhere in Mississippi, but he did not know which body of water, could not otherwise pinpoint the location, and doubted that he could remember it. Further, Appellant had not called or texted anyone on the trip from Texas to Florida. He admitted that he received a call or text on the trip but stated that he had no idea where he was or whether it was received before or after he threw the pistol off the bridge. Kelly said Appellant told her that on his way to her home in Florida, he stopped

on a bridge somewhere between Alabama and Louisiana around 2:00 a.m. and threw away the pistol.

Detective Nolan noted that Appellant had gestured in his interview that he had thrown the loaded pistol out the passenger window of his truck with his right hand. According to Nolan, "It just didn't make sense." Appellant was unable to recall where that location was in relation to where he stopped for gas, but he could recall "little nuances that didn't mean anything" like the cost of his racing boots. Accordingly, Detective Nolan believed Appellant was lying.

### ii. The Bullet

Investigator Reynolds discovered the bullet that killed Lianne lying almost seventeen feet away from the grassy area that tested positive for blood. He testified that the location where he found the bullet would have been consistent with Lianne lying on the ground after she was shot through the throat. Reynolds again emphasized that "the whole place [had been] sprayed down with water," and no genetic material was found on the bullet.

From receipts found in the gun cabinet at Lianne's house and a recorded jailhouse call between Appellant and Kelly, Investigators Reynolds and McGuinn located the company from which Appellant had purchased his pistol and its custom barrel. They then bought identical pieces and had ballistics testing

26

conducted on the bullet. Kevin Callahan, a DPS firearms and tool mark examiner, testified that the custom barrel was capable of firing the bullet.[6]

### iii. The Missing Spent Casing

Appellant told the Florida detectives that he did not look for the spent shell casing after finding Lianne's body. Investigator Reynolds brought a metal detector and an ATF dog to Lianne's Wise County property to search for the shell casing. He did locate shell casings, but not for the pistol. Ranger Pettigrew testified that the K9 dog who searched Lianne's property for the spent casing sat down in the grassy area that tested positive for blood, signaling that gunpowder had been there, but the spent shell casing was never located.

### e. Appellant's Clothing and Lianne's Cell Phone

### i. Appellant's Clothes

In addition to the missing pistol and casing, none of the clothing Appellant wore at the Brookshire's grocery store on April 14, 2014, except his hat, was recovered by law enforcement. Appellant told law enforcement that he had changed clothes and exchanged his boots for tennis shoes before he left for Florida, and that those items were still in Lianne's house in Texas. After Appellant was placed in jail, Lianne's son Daniel and their family friend Ron LoFranco put all Appellant's personal items that he left at Lianne's Wise County

---

[6]To conclude that a bullet was definitely fired from a firearm, the examiner would need the actual barrel the bullet was fired from. However, that was not possible here because Appellant disposed of the pistol.

house in the attic, and Investigator McGuinn had examined all of them. He testified that the clothes and shoes Appellant wore April 14, 2014 were not found. McGuinn repeatedly denied at trial that the Brookshire's video showed that Appellant was wearing boots and stated that "once [the video] was freeze framed and blown up, it . . . looks more consistent with tennis shoes," implying that Appellant killed Lianne and changed shoes before he went to Brookshire's. At trial, the Brookshire's video was admitted into evidence and played for the jury, and the jury also viewed the blown-up pictures of the video frames.

### ii.    Lianne's Cell Phone

Appellant mentioned in his interviews that Lianne had pictures on her cell phone. Police dive teams searched both ponds on Lianne's property, but her cell phone was never found. After the police released the scene, Daniel and LoFranco searched the house and the premises for Lianne's cell phone. They found her .357 magnum handgun in a drawer behind some clothes but did not find her cell phone.

Appellant's mental health expert, Randall Price, agreed that Appellant could have been motivated to dispose of Lianne's cell phone if she had taken photographs of bruises or red marks and confronted Appellant with the pictures. Family friend LoFranco testified that after he returned to Florida from helping Daniel deal with the details of Lianne's death in Texas, Kelly told him that Appellant had thrown Lianne's cell phone in the river along with his pistol.

28

LoFranco reported the information to the prosecutor about a year after Lianne's death.

Investigator Reynolds testified that of the people with access to Lianne's home and property, the person who had the motive and opportunity to get rid of the cell phone, the shell casing, and the clothes Appellant was wearing when Lianne died was Appellant.

In addition, William Wayne Cox, Appellant's former cellmate, testified that Appellant told him in the summer of 2014 that he had taken Lianne's cell phone along with his pistol, a rifle, and a briefcase of cash when he left Lianne's house for Florida.

### f.     The Briefcase

The State's evidence showed a discrepancy between Appellant's documented retirement proceeds, $32,374.36, and the amount of retirement proceeds Appellant told Investigator Reynolds he received, $29,000, which matched Appellant's deposits in two separate accounts in Texas. Investigator Reynolds implied that Appellant was likely carrying the difference in those two amounts, more than $3,000, in the briefcase when he fled to Florida.[7]

### 4.     Lianne's Right-Handedness

Appellant was evasive during the interviews with law enforcement when asked whether Lianne was right- or left-handed. He told the Florida detectives

---

[7]Kelly testified that the briefcase did not contain any money but did contain Appellant's important papers.

29

that he thought Lianne was ambidextrous and that he did not pay attention to which hand she used when they shot guns for fun. He also thought that she might write using her right hand and he did not know which hand she used to hold her cell phone when making calls.

When Detective Nolan asked Appellant if Lianne was left-handed or right-handed, Appellant did not answer the question but instead stated that "she had both hands on the gun" when shooting targets. Detective Nolan also said that when he asked the question, Appellant grabbed hold of Nolan's hands to show him where Lianne's hands were instead of answering the question.

Regarding Appellant's statement that he could not remember which hand Lianne used to hold her cell phone, Detective Nolan testified,

> These are visual observations that we make on a daily basis. . . . He's been in a relationship with her for six months. That is something that . . . he should know . . . . The way that she holds a frying p[an]. You're going to—if you're right-handed, you're going to—majority of the time gonna hold it with your right hand. When I'm asking if she's right-handed, he was unable to answer that question.

Detective Nolan also opined that Appellant should know "how [Lianne would] hold a gun." Nolan testified that even though Appellant "said at one point [that] she did hold [the handgun] with two hands [when] shooting into the pond, . . . he never answered if she ever picked the . . . handgun up with the right or left hand." Nolan further clarified that Appellant did not answer which hand Lianne used to pull the trigger when he saw her shoot targets.

30

In contrast to Appellant, Lianne's children and the medical examiner all testified that Lianne was right-handed.

### 5. Manner of Lianne's Death

#### a. Medical Examiner Testified Suicide Was Not Likely.

Dr. Emily Ogden, a medical examiner at the Southwestern Institute of Forensic Sciences, performed the autopsy of Lianne's body. At trial, Ogden discussed State's Exhibit 97, which shows the entry wound on the left side of Lianne's chin where the neck pivots and soot around the wound.

#### i. Lianne Was Shot at Close Range.

Dr. Ogden testified that the distance between the soot and the entry wound on the body led her to conclude that it was not a contact wound but a close-range wound, meaning that the barrel end of the firearm was anywhere from two to twelve inches away from Lianne's neck when she was shot. On cross-examination, Dr. Ogden admitted that the range in this case was much more likely to be two or three inches.[8]

Dr. Ogden testified that nearly 100% of suicides are classified as contact wounds. In the approximately one hundred suicide autopsies she had performed by Appellant's trial, the only ones in which the wounds were not contact wounds involved shotguns or "some sort of cloth" between the skin and the weapon,

---

[8]Investigator McGuinn testified that the custom barrel added four and a half inches to the length of Appellant's pistol, making the pistol thirteen and a half inches from the end of the custom barrel to the end of the pistol grip.

producing no soot on the body. On cross-examination, she testified that the soot pattern around a wound is bigger the further away the weapon is from the body. She also testified that searing of the skin, as depicted in a photo defense counsel showed her, occurs in a close-range shot because the end of the muzzle is so close to the entry. Dr. Ogden further testified that the soot pattern on Lianne's neck, which was generally the same size all the way around the wound, indicates that the shot was not fired at an angle but was a fairly straight shot.

The exit wound was on the right side of Lianne's scalp. Dr. Ogden could not determine with any certainty whether Lianne was lying down, sitting, or standing when she was shot.

### ii. The Bullet Had a Left-to-Right Trajectory.

Dr. Ogden stated that in addition to the close range of the shot, the trajectory from left to right also made it less likely that Lianne committed suicide because she was right-handed. Ogden stated that it was very uncommon for a person to use her nondominant hand to commit suicide. A right-handed person would usually have a right-to-left trajectory with a contact wound at the right temple. While Dr. Ogden conceded on cross-examination that "under the chin and upward" is a method of shooting oneself and that it is plausible that the pistol was upside down when it was fired, she explained that statistically she would still expect the range to be contact or near contact so the shooter would not miss.

### iii. Only Appellant's Report that Lianne Killed Herself Led to the Classification of Undetermined Death on the Autopsy Report.

Dr. Ogden stated that absent Appellant's story of how Lianne died, her death would have been ruled a homicide. Instead, the autopsy report classified the death as undetermined. On cross-examination, Dr. Ogden admitted that she had doubts about, and did not know, how Lianne's death occurred.

### b. Law Enforcement Also Believed That Lianne's Wound and the Trajectory Did Not Support Suicide.

Like Dr. Ogden, Investigator Reynolds testified that Lianne's wound was not consistent with suicide because the bullet traveled from left to right, and Lianne was right-handed. He therefore testified that it was very unlikely that Lianne could have shot herself. Similarly, Ranger Pettigrew testified that he had been involved with "25 to 30" suicide investigations and that of those involving a gun, the wounds had all been "contact wounds" and he could not recall any involving a pistol shooting underneath the chin. He stated that "[g]enerally they're in the mouth or to the temple."

Detective Nolan testified that if Lianne had held a semiautomatic pistol upside down, against her body, and pulled the trigger with her thumbs—a theory espoused by the defense—there would probably be an abrasion on her hand and a black mark on, and maybe a snag of, her clothing. Investigator McGuinn likewise testified that it is easier for a person to sustain an unintended injury when shooting a semiautomatic pistol rather than a revolver if the weapon is not

33

held properly "[b]ecause the gas from the discharge of the round being fired causes the slide to move towards the rear of the gun, therefore ejecting the shell plus seating the next round." Absent a bruise on her right buttock, no abrasions were found on Lianne's body nor was there any damage to her clothing.

### 6. Appellant's Incriminating Statements to Former Cellmates

### a. Informant William Cox

Informant Cox testified that he had been in the Wise County jail for sixteen months and that he had been the cellmate of Appellant during part of that time. Cox was in jail because he had five felony charges pending. He was already on parole and had four prior felony convictions. Because of his record, he was facing the possibility of confinement for a period in the range of 25 to 99 years or life. He testified that he had not been offered any deal by the State to testify against Appellant and had not asked for one, but he was hoping to get a twenty-five-year sentence. Cox stated that he informed on Appellant because "all of the important women" in his life, including his mother, his sister, and his sister-in-law, had "been beaten and abused" and it "just [ate] on [him] that somebody can supposedly love somebody and then beat them or take their life. It's just wrong."

In the summer of 2014, Informant Cox told his retained counsel that he wanted to talk to law enforcement about what Appellant had told him, and he did so on July 2, 2014, almost a year before Appellant's trial. Cox did not tell his cellmates why he was going to talk to law enforcement. Ultimately, he spoke to Investigator Reynolds and Ranger Pettigrew. Cox testified that Appellant talked

34

extensively to him about his case and that Appellant also discussed his case with three other cellmates.

### i. Informant Cox Reported that Appellant Confessed to Murdering Lianne.

Appellant initially told Informant Cox that he had been arrested for killing his girlfriend but she had committed suicide. Later, according to Cox, Appellant was "mad and was just argumentative and just distraught" after a jailhouse telephone call with his sister Kelly, which apparently provoked him to relate what had happened to Lianne. Appellant told Cox that he had been arguing with his girlfriend about money. Cox testified that Appellant said:

> [S]he had inherited money and . . . he didn't like the way that she had handled it[.] . . . [S]he was running the business that she inherited down the drain taking care of her kids who weren't working and wouldn't get a job.
>
> . . . .
>
> . . . He was tired of . . . her supporting her two kids, specifically her son. She was spending all her money on her son's computer, her son's pickup, [and] her son's cell phone[,] and [her son] wouldn't get a job and . . . he was going back and forth to school and not paying for any of the gas.

Informant Cox also testified that Appellant told him that he had come home from the post office, and his girlfriend had threatened to kill herself. Appellant "had just told her, 'Bitch, I'll do it for you,' and he shot her." Another time, Cox testified, Appellant said that "he had killed the whiny, sniveling bitch and he would do it again."

Cox further said that Appellant told him:

35

- Appellant's girlfriend had been "on dope" and was "doped up";

- the shooting occurred near Bridgeport;

- Appellant used his pistol;

- Appellant wrapped his girlfriend's body up and put her in a garage or barn;

- Appellant wrote a note stating that he was thinking about killing himself and that he was going to Florida to tell the family what happened;

- Appellant loaded a flatbed trailer with a Polaris and mower;

- Appellant took his girlfriend's cell phone, his pistol and rifle, and a briefcase of cash;

- Appellant left for Florida;

- Appellant threw the pistol into the ocean "because he was considering committing suicide";

- "they called and reported it" because Appellant did not think he could be convicted since he thought it looked like a suicide; and

- Appellant "had purchased a special barrel for [the pistol] for target practice, and he was afraid that the ballistics on the barrel would be taken and the ballistics would match the bullet."

Cox testified that Appellant "went back and forth" from saying he had killed Lianne to saying that she had committed suicide. In addition, Cox testified that after learning that Cox had incriminated him, Appellant threatened him through another inmate.

### ii. Informant Cox's Testimony was Sufficiently Corroborated.

Ranger Pettigrew testified that Informant Cox disclosed specific corroborating facts in his interview with law enforcement that he could have

36

obtained only from Appellant—such as where the death occurred, where the wound was, and that the cell phone was disposed of—and facts that law enforcement did not know about before that interview—like the briefcase of cash Appellant took to Florida.

Investigator McGuinn testified that Cox's statement was turned over to the defense soon after he gave it, and a month later, Cox was moved out of Appellant's cell. McGuinn then interviewed other inmates who had been housed with Appellant. Every inmate or former inmate McGuinn interviewed stated that it was possible for conversations to be held in the cell while other inmates were sleeping. McGuinn admitted that one of them, Dallas Tate, said that he never heard Appellant talk about his case while he was in the cell with Appellant and he thought Cox was lying. But, McGuinn said that Tate admitted that Appellant and Cox could have had conversations while Tate was asleep. Finally, McGuinn admitted that he did not interview everyone who was Appellant's cellmate when a conversation between Appellant and Cox could have occurred.

Another inmate, Carl William Lackey, testified that he was currently in jail for a drug-related offense, he knew Cox, and Cox told him he was going to get his charges dropped by informing on someone else.

### b. Tyler Chapman

Another former cellmate of Appellant's, Tyler Chapman, testified that in July 2014, he was arrested for aggravated robbery, that he had pled guilty to a lesser charge, and that he was on deferred adjudication community supervision

37

as a result of that plea. He also testified that he had not been offered anything for his testimony. Chapman knew that Appellant had been charged with murder because it "got talked about several times." Chapman testified that within two or three minutes of a new inmate walking into the cell, Appellant "boasted out that he was in there for murder." Chapman explained that Appellant "said it . . . with a . . . smirk and kind of in a mocking way, kind of like he was downplaying it, like it was kind of funny," and was laughing at the time.

Chapman said that Appellant told him:

- Appellant's girlfriend's father had committed suicide five years before her death, "and he implied that that would make it more believable that she actually would have killed herself also";

- "all that matters is that it looks like she killed herself";

- the medical report was in his favor;

- Cox would not be believed because of his extensive record and "they would think he's just trying to get off the hook with his current charge that he was in there for";

- Cox was lying in the statement against Appellant;

- "lying is what will get you killed"; and

- Cox was lucky that he had been moved to a different cell.

### 7. Lianne's Mental State

#### a. The Defense's Portrayal

With almost perfect consistency in his interviews with law enforcement, Appellant insisted that Lianne killed herself. Of all the witnesses, only Appellant indicated that Lianne was mentally unstable when she died. He described her as

38

suffering from menopause and a hormonal imbalance. He said she was moody and could be violent—"a little time bomb" who could get "devilish mad, . . . scary mad." Appellant theorized that Lianne had killed herself because of her father's suicide, her feud with her sister, her mother's disowning her before her death, and the pills that he said she took on the day of her death. Appellant admitted that he did not find a suicide note from Lianne and told the Florida detectives that she never threatened to kill herself or him. Rather, he theorized that she used his gun to hurt him.

Although Appellant named Lianne's alleged drug use as a factor in her death, the toxicology report completed during the autopsy indicated that Lianne had not taken any type of controlled substance and had no alcohol in her system.

Kelly joined her brother in testifying about Lianne's stressors that could have led to suicide, but Kelly also admitted that she might have told the police that she was surprised that Lianne would have killed herself because she thought Lianne was more stable than that. Kelly also said that Lianne never told her that she wanted to kill herself.

Robin White, Lianne's estranged sister, testified for the defense. Robin testified that her family had a history of depression but she did not know if Lianne suffered from depression. Robin reported that Lianne had been hospitalized in a psychiatric ward for about a week in 1979, when she was sixteen years old, because she was burning herself. Robin admitted that she had not been around Lianne for any extended length of time since 2009, but stated that Lianne had an

39

"excitable, grandiose personality" with severe mood swings. Robin also testified, though, that Lianne had a strong personality, was physically strong, and would have fought back if attacked.

Dr. Price, a clinical and forensic psychologist, testified for the defense as an expert witness. He stated that he "did find [some] evidence of risk factors for suicide in the case of Lianne," based on his review of the evidence and an approximate ninety-minute telephone conversation with Robin. As risk factors, Dr. Price pointed to:

- Lianne's age and gender;

- her "anxiety, in the form of sleep deprivation";

- her early hospitalization for burning herself;

- Appellant's report of her mood fluctuations;

- Lianne's family history of depression and suicide;

- Lianne's financial stress; and

- Lianne's relationship issues with Appellant and her family.

On cross-examination, Price testified that he never interviewed Appellant or Lianne's children.

Ranger Pettigrew testified that of all the people he spoke to in this case and whose interviews he reviewed, only Appellant described Lianne as mentally

40

unstable, depressed or suicidal, unable to control her anger, or having abused drugs or alcohol.[9]

### b. The State's Portrayal

The prosecution sought to portray Lianne as mentally and emotionally tough and looking forward to the future.

### i. Lianne Was Strong.

In a voice mail Lianne left Appellant six weeks before her death, she threatened to end the relationship—not kill herself—because of his controlling behavior.

Lianne's daughter Allisyn testified that she and her mother spoke every day. Allisyn described Lianne as a "determined," "independent, [and] strong woman." Lianne's close friends Vivian Lewis and Randall Mark Brown echoed Allisyn's assessment of her mother as strong.

Allisyn testified that her mother would fight for herself and walk away if there were problems in a relationship and that she would not tolerate abuse. Indeed, Lianne had left Daniel's father after he kicked her in the stomach when she was six months pregnant with Daniel. Allisyn firmly believed that her mother would have fought an attacker to the death.

_____

[9]He admitted that he did not speak to Robin or review her interview.

### ii. Lianne Would Not Consider Suicide.

Allisyn admitted that her maternal grandfather's suicide had been very traumatic for Lianne. But, Allisyn also testified that she and Lianne had discussed how neither woman would commit suicide due to the suffering their children would endure. Lianne's close friends Ron LoFranco and Vivian Lewis confirmed that Lianne had been angry about her father's suicide and had said that she would "never do [that] to [her] kids."

### iii. Lianne Was Focused on the Future.

Allisyn and Lianne's friends testified that Lianne was looking forward to the future. Nine days before her death, on April 5, 2014, Lianne sent Allisyn, who was eight months pregnant, a text saying, "I'm taking care of a one-year-old baby girl, I see all the baby stuff and think of you and I'll be there soon" and asking Allisyn when she should come to Florida for her new grandchild's birth. The last text Lianne sent Allisyn, which was sent April 12, 2014, indicated that Lianne was working an extra shift to buy her plane ticket to Florida.

Roxanne Martin, from Azle, Texas near Lianne's Wise County home, testified that Lianne worked an extra overnight shift ending on April 13, 2014 at 8:00 a.m. in Martin's home caring for her disabled son. Martin testified that Lianne told her that she was moving to Florida, was very happy, and "didn't appear to have any problems that night at all."

42

### iv.  Lianne's Stress Level Was Normal and She Was Not Depressed.

Allisyn testified that her mother had no mental health history, was not depressed, and was never suicidal.  However, Allisyn admitted that a defense exhibit showed that Lianne was diagnosed with anxiety the month before she met Appellant and that she had suffered from insomnia for a long time.

Allisyn testified that financial stress was normal for Lianne except during the nursery's busy season but that her financial situation had improved by the time she died.  Daniel and Lianne's friends likewise testified that Lianne's finances had stabilized.

### v.  The State's Expert Found No Credible Evidence that Lianne Would Have Contemplated Killing Herself.

The State's mental health expert, David Sabine, a clinical psychologist in private practice in Wichita Falls who also has an expertise in forensic psychology, testified that only Lianne's age (fifty-one) provided any risk of suicide, so she would have been at a low risk had she been formally evaluated. He also testified that having a family member who has committed suicide is just one risk factor and is worth only a normal weight.  Dr. Sabine conceded that sleep deprivation could be a risk factor for suicide for persons "extremely compromised" by lack of sleep.  On the other hand, he also testified that a person's reducing her credit card debt and expressing hope for the future would "decrease the likelihood that the person . . . is contemplating suicide."  Sabine

further testified that from his review of the evidence, "[i]t appeared in the things that [Lianne] wrote that she was planning assertively and with [a] considerable amount of . . . excitement and anticipation" and that he "did not see much at all that suggested [that Lianne was] someone who would be the kind of person who would have completed suicide." Finally, Dr. Sabine said that "[t]he only suggestion of [Lianne's] instability came from [Appellant]."[10]

### 8. Appellant's Mental State

#### a. Appellant Had Motive to Kill.

The State's theory was that Appellant had killed Lianne sometime on April 14, 2014 after she arrived home from work because she had told him to leave the night before. Kelly agreed on cross-examination that the level of animosity between her brother and Lianne was suddenly much higher on the night of April 13 and that Appellant would have been very upset if Lianne had told him to leave or threatened to call the police. Dr. Price buttressed the State's theory by admitting on cross-examination that Lianne's telling Appellant to leave or that she was going to call the police could be considered a motive for murder.

#### b. Appellant Impugned Lianne's Character.

Law enforcement thought Appellant was lying in his interviews. Detective Nolan said that generally in his experience, "[i]t . . . throws out a flag when" a

---

[10]Sabine admitted on cross-examination that he had not been told there was a family history of depression and that he had not known about Lianne's stay in a psychiatric ward when she was sixteen years old before the day he testified.

44

person is asked a specific question but "go[es] off on a tangent and talk[s] about something completely different, especially when they start justifying or enforcing their character and demolishing the other person's character."  Appellant did this repeatedly in his interviews.

For example, Nolan told the jury that in his interview of Appellant,

- Appellant showed very little love for Lianne;

- From the way Appellant explained it, his relationship with Lianne was one-sided, where he provided for her but she was "just mean and rude";

- Appellant was trying to portray Lianne as "a ticking time bomb" with "anger issues" and "outrages of violence" and "himself as [her] white knight";

- Appellant described Lianne as "verbally aggressive" without indicating whether his response was aggressive;

- Appellant's description of the couple's interaction the morning after their fight "didn't sound right.  You have the hostile confrontation the day before, the hostile texts throughout the night where he has to call up and make sure that everything is okay between them, and then the next day she's all sweetness and like wanting to hug and kiss";

- Appellant did not seem upset in describing the crime scene and was "[v]ery, very descriptive of [Lianne's] injuries";

- Appellant did not show that he missed Lianne; and

- Appellant "blamed [Lianne for her death] immediately."

Similarly, Investigator Reynolds testified that while Appellant got emotional at times during their videotaped exchange, he shed no tears.

45

### c. Appellant Behaved Like a Criminal When He Discovered the Body and Showed No Concern that an Intruder Might Be Involved.

Ranger Pettigrew was immediately suspicious of Appellant's account of what he did when he found Lianne's body. Pettigrew testified:

> The actions that [Appellant] took with . . . the body, predominantly somebody came home, found somebody dead, the first thing that struck me was he never went inside to see if she was possibly killed by another person. He . . . never talked about fearing for his safety. He never called 911, if somebody would have murdered her. He never checked the scene. He had no self-preservation whatsoever.

> From his statement, he immediately deduced that it was suicide and . . . set about securing the body, wrapping up the body, hiding it, or secreting it, washing down the scene, taking the gun and other evidence from the location with him as he fled.

## E. Analysis of the Evidence

Viewing the evidence in the light most favorable to the verdict, we hold that the jury could have properly found beyond a reasonable doubt that Lianne's threatening to call the police and telling Appellant to leave her property—after all the time and money he had spent improving it—led Appellant to intentionally or knowingly kill her with his pistol, to attempt to create an alibi, and to lie to law enforcement about the timing and cause of her death. The jury could have properly determined that discrepancies within his statements and evidence that he hid the body, destroyed the crime scene, disposed of both the pistol and Lianne's cell phone, and fled the scene also point to his guilt. We therefore hold that the evidence is sufficient to support Appellant's conviction for murder, and

46

thus overrule his first and second issues. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

## III. Testimony of Informant Cox

In Appellant's third and fourth issues, he challenges the trial court's admission of Informant Cox's testimony over his rule 403 objection. Rule 403 of the rules of evidence allows the trial court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. In conducting a rule 403 analysis, a court must balance the probative force of the evidence and the proponent's need for it against any tendency that evidence may have to lead the jury to resolve an issue on an incorrect ground "or [to] distract the jury from the main issues." *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). The court must also evaluate how much time the proponent would need to develop the evidence, whether the evidence is repetitive of evidence already admitted, and whether the jury is able to fairly consider the evidence. *Id.* at 641–42.

We review a trial court's decision to exclude evidence for an abuse of discretion. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). A trial court does not abuse its discretion when its decision to exclude the evidence is within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

### A. The Trial Court Did Not Err by Not Conducting a Balancing Test on the Record Before Admitting Informant Cox's Testimony.

In his third issue, Appellant contends that the trial court erred by failing to conduct an adequate balancing test on the record after Appellant objected to Informant Cox's testimony.

Here, Appellant filed a pretrial motion objecting to Cox's testimony and requested the trial court to conduct a balancing test under rule of evidence 403 before allowing him to testify. The State filed a response setting out the facts it anticipated that Informant Cox would testify to as well as corroborating evidence that it expected to be admitted at trial. Before Cox testified at trial, the trial court held a hearing on the motion outside the presence of the jury. The trial court denied the motion. The prosecutor asked the trial judge, "just for appellate purposes," to "state on the record" that he had conducted the balancing test. The trial judge replied, "No. I—that's—they will figure that, Counsel."

The trial court was correct. The law does not require the trial court to conduct the balancing test on the record or to state its findings and conclusions based on the test, *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997), nor does the law require that the trial court state on the record that it has conducted a balancing test, *Reyes v. State*, 480 S.W.3d 70, 77 (Tex. App.—Fort Worth 2016, pet. ref'd). When the trial court rules on an objection under rule 403, we presume that it has engaged in the required balancing test, *Williams*, 958 S.W.2d at 195; *Sanders v. State*, 422 S.W.3d 809, 816 n.8 (Tex. App.—Fort

48

Worth 2014, pet. ref'd), absent evidence showing that the trial court did not perform the test. *Rojas v. State*, 986 S.W.2d 241, 250 (Tex. Crim. App. 1998); *Distefano v. State*, No. 14-14-00375-CR, 2016 WL 514232, at *3 (Tex. App.— Houston [14th Dist.] Feb. 9, 2016, pet. ref'd).

As for Appellant's contention that his objection "required the trial court to consider the circumstances surrounding the alleged jailhouse confession in light of the corroboration evidence" in performing the balancing test, he offers no legal support for such a requirement and no evidence that the trial court did not do so. We overrule Appellant's third issue.

## B. The Trial Court's Admission of Informant Cox's Testimony Is Not Reversible Error.

In his fourth issue, Appellant contends that the trial court abused its discretion by admitting Informant Cox's testimony. However, a trial court's erroneous admission of evidence will not require reversal when other such evidence was received without objection, either before or after the complained-of ruling. *Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010), *cert. denied*, 562 U.S. 1142 (2011); *Lane v State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004). This rule applies whether the other evidence was introduced by the defendant or the State. *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998). An exception to this rule occurs when a defendant offers evidence identical to that to which he earlier objected to rebut, destroy, or explain the previously admitted evidence. *Id.* at 718–19; *Rogers v. State*, 853 S.W.2d 29,

49

35 (Tex. Crim. App. 1993). Finally, we review a trial court's evidentiary ruling based on what was before the court when it made its ruling. *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002); *Calton v. State*, No. 2-04-228-CR, 2005 WL 3082202, at *5 (Tex. App.—Fort Worth Nov. 17, 2005, no pet.) (mem. op., not designated for publication).

Before the trial court held the hearing on Appellant's rule 403 objection to Informant Cox's testimony, Dr. Emily Ogden testified without objection on cross-examination that she spoke with Investigator McGuinn and the prosecutor on July 30, 2014, and that they showed her a video of Informant Cox reporting that Appellant confessed to murdering Lianne. Accordingly, even if the trial court abused its discretion by admitting Cox's testimony over Appellant's rule 403 objection, which we do not hold, such error would not have been reversible. *See Mayfield v. State*, Nos. 2-05-00386-CR, 2-05-00387-CR, 2007 WL 938697, at *2–3 (Tex. App.—Fort Worth Mar. 29, 2007, pet. ref'd) (mem. op., not designated for publication) (holding Mayfield failed to preserve error regarding some of a challenged witness's testimony because other witnesses testified to the same subject matter before the trial court granted a running objection to the challenged witness's testimony); *cf. Roderick v. State*, 494 S.W.3d 868, 881 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (holding the defendant failed to preserve error in the admission of the State's evidence of prior convictions by offering the evidence first); *Johnson v. State*, 981 S.W.2d 759, 761 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd) (same). We overrule Appellant's fourth issue.

50

**IV.** **The Trial Court Did Not Abuse Its Discretion by Denying Appellant's Motion for Mistrial after Ranger Pettigrew Referred to a Polygrapher.**

In his fifth issue, Appellant contends that the trial court erred by failing to grant a mistrial after Ranger Pettigrew referred to a "nonexistent polygraph examination" in his direct testimony. Within this issue, Appellant also complains about the trial court's failure to instruct the jury to disregard Ranger Pettigrew's comment about the polygrapher. However, Appellant did not request such an instruction.

Specifically, when Ranger Pettigrew was being questioned, the following occurred:

> Q.  Okay.  And I don't know if you did or did not have the opportunity to watch at least Detective Patton's portion of the second interview as it was being conducted.
>
> A.  I believe—I believe we were waiting with the polygrapher and—
>
> [Defense Counsel]:  Objection, your Honor. May we approach?
>
> THE COURT:  Yes.
>
> (At the bench, off the record)

Later, after another bench conference, defense counsel put the following on the record outside the jury's presence:

> [Defense Counsel]:  Judge, this is just a matter we discussed at the bench.  When Ron Pettigrew, the Texas Ranger, was testifying, he made a reference to a polygrapher, and I approached and objected and you sustained the objection.  And I moved for mistrial because I believed that that portrayed to the jury that he had probably

51

|  |  |
|---|---|
| | taken a polygraph and failed, which is not true. And therefore, I request[ed] a mistrial on that basis. And you said you were going to carry it along, and I just wanted that on the record. |
| THE COURT: | I've carried it. |
| | . . . . |
| THE COURT: | And to make the record complete on the conversation, the State did ask for—or suggest an instruction to the jury to disregard, which I disregarded that because in my opinion, under the circumstances, it would have called greater attention to it than it already had. That's enough about that. |

The trial court then denied the request for mistrial after the jury verdict.

The traditional and preferred procedure for preserving error is to (1) object, (2) request an instruction to disregard, and (3) move for a mistrial. *Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004). While a prompt motion for mistrial without the first two steps may preserve error on a complaint, reversal will not be required if a ruling on an objection or request for instruction to disregard would have cured the harm flowing from the prejudicial event. *Id.* at 70–72; *see Unkart v. State*, 400 S.W.3d 94, 99 (Tex. Crim. App. 2013) (holding that solely moving for mistrial will preserve error if timely objection or instruction to disregard would not have cured the harm flowing from the improper comment); *Brewer v. State*, 367 S.W.3d 251, 253 (Tex. Crim. App. 2012) ("The appellant did not request a curative instruction before moving for a mistrial—a choice that forfeited

52

appellate relief for [prejudice] that could have been cured by such an instruction." (citation omitted)).

We review a trial court's denial of a motion for mistrial for an abuse of discretion. *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010), *cert. denied*, 564 U.S. 1020 (2011). We uphold the ruling if it lies within the zone of reasonable disagreement. *Id.* In determining whether the trial court abused its discretion by denying the mistrial, we balance three factors: (1) the severity of the misconduct or prejudicial effect; (2) curative measures; and (3) the certainty of the conviction absent the misconduct. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998), *cert. denied*, 526 U.S. 1070 (1999). In polygraph cases, we may also consider whether the party through whom the evidence was elicited showed bad faith in putting the evidence before the jury and whether the polygraph evidence strengthened the State's case. *Reed v. State*, 497 S.W.3d 633, 639 (Tex. App.—Fort Worth 2016, no pet.); *Martines v. State*, 371 S.W.3d 232, 251 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

It has long been recognized that because of their inherent unreliability and tendency to be unduly persuasive, the results of a polygraph examination are not admissible in Texas for any purpose. *Nethery v. State*, 692 S.W.2d 686, 700 (Tex. Crim. App. 1985), *cert. denied*, 474 U.S. 1110 (1986); *Reed*, 497 S.W.3d at 639. Generally, however, it has likewise been recognized that an instruction to disregard is sufficient to cure any prejudice when a polygraph is

merely mentioned nonresponsively by a witness and results, if any, are not disclosed. *Richardson v. State*, 624 S.W.2d 912, 914–15 (Tex. Crim. App. [Panel Op.] 1981); *Roper v. State*, 375 S.W.2d 454, 456–57 (Tex. Crim. App. 1964).

In this case, because Appellant did not request the instruction, he has forfeited his complaint about its absence. *See Brewer*, 367 S.W.3d at 253; *see also Williams v. State*, No. 12-01-00311-CR, 2003 WL 1883474, at *3 (Tex. App.—Tyler Apr. 16, 2003, no pet.) (mem. op., not designated for publication) (holding appellant failed to preserve error when, after his objection to polygraph evidence was sustained, he asked for mistrial instead of instruction to disregard and did not renew his request for mistrial after trial court instructed jury to disregard upon State's suggestion).

Certainly there are instances where an instruction to disregard will not cure the prejudice of polygraph evidence and the absence of an instruction will not forfeit the appellant's complaint about the trial court's denial of a mistrial. *See, e.g., Kugler v. State*, 902 S.W.2d 594, 596 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (explaining that despite the instruction to disregard, the repetition of evidence that defendant refused a polygraph heightened its persuasive effect in a case in which the complainant was the only witness who could identify him as her attacker). This is not the case here because the record indicates that Ranger Pettigrew mentioned the polygrapher inadvertently and did in no way disclose or allude to test results. When a witness gives a nonresponsive answer that

mentions a polygraph test but does not mention the results of the test, there is no error in denying a mistrial. *Martines*, 371 S.W.3d at 251; *Barker v. State*, 740 S.W.2d 579, 583 (Tex. App.—Houston [1st Dist.] 1987, no pet.). We therefore hold that the trial court did not abuse its discretion by denying Appellant's motion for mistrial, and we overrule his fifth issue.

**V.     The Trial Court Did Not Abuse its Discretion by Denying a Mistrial at Punishment Based on the Prosecutor's Argument That There Was No Difference Between a Sixty-Year Sentence and a Life Sentence.**

In his sixth and seventh issues, Appellant contends that the trial court erred and abused its discretion by not granting a mistrial based on the prosecutor's argument at the punishment phase implying that there was no difference between assessing a sixty-year sentence and assessing a life sentence.

After the close of evidence at the punishment phase but before the parties' arguments, the trial court instructed the jury as follows regarding parole:

> It is also possible that the length of time for which the Defendant will be imprisoned might be reduced by the award of parole.
>
> Under the law applicable in this case, if the Defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, without the consideration of any good conduct time he may earn. Eligibility for parole does not guarantee that parole will be granted.
>
> . . . .
>
> You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular

55

Defendant. You are not to consider the manner in which the parole law may be applied to this particular Defendant.

During the State's closing argument at the punishment phase, the prosecutor argued:

> You know, that charge that the Judge just read to you is your guide, and there's two parts of punishment. There's the time and there's the fine. I'm going to talk to you about each just real quick.
>
> One, on the time, a person sentenced to murder becomes eligible for parole only after they've served half of their sentence, or 30 years, whichever is less. Basically what that means, 60 years to life, as far as parole goes, is the same thing, a person becomes eligible. So anything you give over 60 years is just a statement as to how serious—
>
> [Defense Counsel]: Your Honor, I object to this. This is going beyond what the charge says about parole.
>
> THE COURT: Overruled.
>
> [The State]: It's just a statement as to how serious you think this crime is. . . . And we are going to be asking you for the maximum, life in the penitentiary and a $10,000 fine.

Appellant did not request a mistrial in the trial court and does not argue here that the trial court abused its discretion by failing to grant a mistrial sua sponte. *See Morris v. State*, 565 S.W.2d 534 (Tex. Crim. App. 1978) (holding the trial court did not abuse its discretion by not granting a mistrial sua sponte after sustaining an objection to the prosecutor's argument that the defendant was receiving illegal income). In the interest of justice, we will construe these two issues as complaints about the trial court's overruling of Appellant's objection to the prosecutor's argument.

To be permissible, the State's jury argument must fall within one of the following four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or (4) plea for law enforcement. *Felder v. State*, 848 S.W.2d 85, 94–95 (Tex. Crim. App. 1992), *cert. denied*, 510 U.S. 829 (1993); *Alejandro v. State*, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973). When a prosecutor accurately restates or explains the law on parole eligibility given in the charge without providing information beyond the charge, such argument is proper. *Taylor v. State*, 233 S.W.3d 356, 359 (Tex. Crim. App. 2007) (majority op.); *id.* at 360 (Womack, J., concurring); *Waters v. State*, 330 S.W.3d 368, 372–75 (Tex. App.—Fort Worth 2010, pet. ref'd). Encouraging the jury to speculate about when or whether a defendant could be granted parole is not proper. *Taylor*, 233 S.W.3d at 360 (Womack, J., concurring); *Waters*, 330 S.W.3d at 374.

Here, the prosecutor accurately restated the law on parole as it applies to those convicted of murder and as it was given in the jury charge. *See* Tex. Gov't Code Ann. § 508.145(d) (West Supp. 2016) (providing generally that an inmate serving a sentence for offenses described by article 42A.054(a) of the code of criminal procedure is not eligible for release on parole until his actual calendar time served equals one-half of the sentence or thirty calendar years, whichever is less); Tex. Code Crim. Proc. Ann. art. 42A.054(a)(2) (West Supp. 2016) (listing murder). At the same time, the prosecutor made a proper plea for law enforcement. *See Waters,* 330 S.W.3d at 375. The prosecutor did not travel

outside the bounds of the charge to encourage the jury to speculate on matters not properly before it (such as when or whether Appellant might be granted parole) in assessing punishment. *See Taylor*, 233 S.W.3d at 360 (Womack, J., concurring); *Waters*, 330 S.W.3d at 374. We therefore hold that the argument was proper, and the trial court did not abuse its discretion by overruling Appellant's objection. We overrule his sixth and seventh issues.

## VI. Conclusion

Having overruled Appellant's seven issues, we affirm the trial court's judgment.

/s/ Mark T. Pittman
MARK T. PITTMAN
JUSTICE

PANEL: WALKER, MEIER, and PITTMAN, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: April 6, 2017